**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| AVADIM HEALTH, INC., et al.,[1] | ) | Case No. 21-10883 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**MOTION FOR ENTRY OF AN ORDER (A) AUTHORIZING AND APPROVING THE
DEBTORS' ENTRY INTO THE STALKING HORSE APA WITH THE STALKING
HORSE BIDDER, SUBJECT TO THE BIDDING PROCEDURES AND THE SALE
HEARING, (B) APPROVING BIDDING PROCEDURES, (C) SCHEDULING
THE BID DEADLINES AND THE AUCTION, (D) SCHEDULING A HEARING
TO CONSIDER THE TRANSACTION, (E) APPROVING THE FORM AND
MANNER OF NOTICE THEREOF, (F) APPROVING CONTRACT
PROCEDURES, AND (G) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors") in the

above-captioned chapter 11 cases (the "Chapter 11 Cases") file this motion (this "Motion")

and, in support thereof, rely upon and incorporate herein by reference the *Declaration of

Keith Daniels, Chief Restructuring Officer of the Debtors, in Support of the Debtors' Chapter

11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously

herewith, and respectfully state as follows:

**Relief Requested**

1.    The Debtors seek entry of an order substantially in the form attached to this Motion

as **Exhibit A** (the "Bidding Procedures Order"):

---

[1] The Debtors, along with the last four (4) digits of each Debtor's federal tax identification number are: Avadim Health, Inc. (8411); Avadim Health IP, Inc. (7594); Bionome Properties Corp. (6483); Quality Assurance Associates, Inc. (5613); and Relion Manufacturing, Inc. (0430). The Debtors' business address is 81 Thompson Street, Asheville, NC 28803.

(a)    approving the proposed bidding procedures (the "Bidding Procedures") and granting the Debtors authority to designate Midava Holdings 3, Inc. as the Stalking Horse Bidder, subject to the parameters set forth in the Bidding Procedures, attached to the Bidding Procedures Order as **Exhibit 1**;

(b)    approving the procedures set forth herein for the assumption and assignment of certain executory contracts in connection with the sale (the "Assignment Procedures");

(c)    establishing a date for holding the auction (the "Auction") and approving certain procedures in connection therewith;

(d)    scheduling the hearing (the "Sale Hearing") to approve any sale transaction(s) to the highest or best bidder for the Company Assets and establishing deadlines for objections and responses to the relief requested in a sale order to be filed in advance of the Sale Hearing (the "Sale Order"); and

(e)    approving the form and manner of notice to be served upon certain parties, including: (i) the form and manner of the notice of the Sale of the Company Assets, the Auction, and the Sale Hearing, the form of which notice is attached to the Bidding Procedures Order as **Exhibit 2** (the "Notice of Auction and Sale Hearing") and **Exhibit 3**, (the "Publication Notice") and (ii) the form and manner of notice of (A) the potential assumption and assignment by the Debtors of contracts and (B) proposed cure amounts, the form of which notice (the "Assumption Notice") is attached to the Bidding Procedures Order as **Exhibit 4**.

2

2.     The Debtors further request the Court, at the Sale Hearing, enter the Sale Order approving the Sale to the Stalking Horse Bidder or other Successful Bidder at the Auction, and authorizing the assumption and assignment of contracts in connection with the Sale.

### Jurisdiction and Venue

3.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution. The Debtors confirm their consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.     The statutory predicates for the relief sought herein are sections 105, 363, and 365 of chapter 11 of title 11, United States Code (the "Bankruptcy Code"), Rules 2002(a)(2), 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1(b), 6004-1 and 9006-1.

**Background**

6.      On the date hereof (the "<u>Petition Date</u>"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases, and no committees have been appointed or designated.

7.      Founded in 2007, Avadim Health, Inc. (collectively referred to herein with its Debtor affiliates as the "<u>Company</u>") is a vertically integrated healthcare and wellness company that sells topical products to improve immune health, neuromuscular health, and skin barrier health. The Company has commercialized a number of products under two brand families: Theraworx Protect, which targets institutional care and community health, and Theraworx Relief, marketed through retail pharmacies. As of the end of 2019, the Company's products were used in approximately 300 acute care hospitals, 850 nursing homes and other long-term care facilities, and were available in more than 49,000 pharmacy locations worldwide. The Company maintains its own research and development, manufacturing and commercialization infrastructure, and is strategically positioned to take advantage of several emerging trends in healthcare: antibiotic stewardship, negativity around opioids, consumerization of healthcare and growth in self-care. The Company's products are designed to take advantage of the increasing desire for easily accessible, self-directed care, with options that are safe and easy to use.

4

8.      The factual background regarding the Debtors, including their historical business operations and the events precipitating the chapter 11 filing, is set forth in detail in the First Day Declaration.

## The Marketing Process

9.      Prior to the Petition Date, the Debtors engaged SSG Advisors, LLC ("SSG") as exclusive investment banker to market and sell all or substantially all of the Debtors' assets (the "Company Assets") in accordance with the terms and conditions of the engagement agreement between the Debtors and SSG. The Debtors selected SSG as their investment banker based upon SSG's excellent reputation for its investment banking services.

10.      To ensure that the Stalking Horse APA (as defined below) is a value-maximizing transaction, the Debtors intend to market test the transaction. Prior to the Petition Date, the Debtors made significant preparations to conduct this marketing process. In May 2021, the Debtors engaged SSG as investment banker. In order to commence a comprehensive process that ensures the Stalking Horse APA is the highest and best transaction available under the circumstances, the Debtors and SSG worked with management to develop marketing materials, financial forecasts, and a list of potentially interested parties to be contacted, and prepared for access to for potential bidders to the Debtors' information. SSG has established and continues to maintain a due diligence data room for interested parties. SSG has prepared additional documentation in support of the marketing effort and is prepared to move expeditiously to provide further information to potential bidders. SSG will continue to move the process forward in a manner that is intended to maximize interest in the transaction on an expeditious timeframe.

5

11.     The prepetition marketing efforts resulted in the Stalking Horse Bidder's submission of a bid for the Company Assets (the "Stalking Horse Bid") pursuant to that certain Asset Purchase Agreement (the "Stalking Horse APA"), dated as of May 31, 2021, which sets a floor for the sale of the Company Assets (the "Sale").  A copy of the Stalking Horse APA is attached hereto as **Exhibit B**.

12.     The Bidding Procedures provide interested parties with the opportunity to qualify for and participate in an auction for the Company Assets to be conducted by the Debtors and to submit competing bids for the Company Assets.  The Debtors will provide notice of the Motion to all parties that the Debtors believe may be potentially interested in acquiring the Company Assets. The electronic data room has been, and will continue to be, available to interested parties that execute confidentiality agreements acceptable to the Debtors.

13.     The Debtors believe that the Bidding Procedures proposed hereby will enable the efficient sale of the Company Assets at an auction to the highest or best bidder.  The Debtors will continue to market the Company Assets pending the outcome of the auction.  In light of the extensive marketing process already undertaken, and the additional efforts that will be made during the proposed sale process, the timing of the Sale proposed herein is reasonable under the circumstances to effectuate a sale of the Company Assets.

14.     The Debtors also believe that marketing of the Company Assets over the period contemplated by the Bidding Procedures, in addition to the marketing activities that have taken place to date, will result in the highest or best price for the assets and maximize value for all of the Debtors' constituents.

6

**Key Dates**

| Proposed Date | Event(s) |
|---|---|
| June 14, 2021 by 5:00 P.M. (prevailing Eastern Time) | Bidding Procedures Objection Deadline |
| July 5, 2021 by 5:00 P.M. (prevailing Eastern Time) | Sale Objection Deadline; Cure/Assignment Objection Deadline |
| July 26, 2021 by 11:59 A.M. (prevailing Eastern Time) | Bid Deadline |
| July 27, 2021 by 5:00 P.M. (prevailing Eastern Time) | Debtors to determine which Bids are Qualified Bids and notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder; Debtors to provide the Stalking Horse Bidder and each Qualified Bidder (i) Notice of No Auction to be Held (if applicable), or (ii) Notification of Baseline Bid (if Auction is to be held) |
| July 28, 2021 at 10:00 A.M. (prevailing Eastern Time) | Auction (if any), which will be held virtually, subject to the right of the Debtors, in the reasonable exercise of their business judgment, to adjourn the Auction to a later date |
| July 29, 2021 by 5:00 P.M. (prevailing Eastern Time) | Post-Auction Objection Deadline |
| [July 30, 2021 at 10:00 A.M.] (prevailing Eastern Time) | Sale Hearing |

| Proposed Date | Event(s) |
|---|---|
| August 9, 2021 | Deadline to Close the Sale |

### Stalking Horse APA

15.     The Stalking Horse APA includes various customary representations, warranties

and covenants in the context of a sale under section 363 of the Bankruptcy Code by and from the

Debtors and the Stalking Horse Bidder.  In addition, the Stalking Horse APA includes certain

conditions to closing the contemplated Sale and customary termination rights.  In accordance with

Local Rule 6004-1, the significant terms of the Stalking Horse APA are summarized below, subject

to the terms of the Stalking Horse APA itself.

### Concise Statement of Relief Requested and Disclosures

16.     In accordance with Local Rule 6004-1, below are certain provisions to

be highlighted in accordance with Local Rule 6004-1(b)(iv):[2]

| Provisions to be Highlighted Pursuant Local Rule 6004-1(b)(iv) | |
|---|---|
| **Sale to Insider**<br><br>Del. Bank. L.R. 6004-1(b)(iv)(A) | The Stalking Horse Bidder is not an insider of the Debtors as defined in section 101(31) of the Bankruptcy Code. |
| **Agreements with Management**<br><br>Del. Bank. L.R. 6004-1(b)(iv)(B) | At this time, the Stalking Horse Bidder has not entered into any agreements with management or key employees regarding compensation or future employment. However, pursuant to Section 6.6(a) of the Stalking Horse APA, the Stalking Horse Bidder may in its sole discretion provide offers of employment to the executive management of the Debtors; which in each such |

---

[2]     The summaries and descriptions herein are intended solely for informational purposes and, in the event that such summaries conflict with any actual document, the terms and provisions of such actual document shall control. Capitalized terms used herein that are not otherwise defined shall have the meanings given to them in the Stalking Horse APA.

| | |
|---|---|
| | case shall provide at least the same base salary or hourly wage rate, employee benefits that are comparable in the aggregate to those provided by the Debtors immediately prior to Closing, and such other terms and conditions determined by the Stalking Horse Bidder in its sole discretion.<br><br>(Section 6.6(a)(ii) of the Stalking Horse APA) |
| **Releases**<br><br>Del. Bank. L.R. 6004-1(b)(iv)(C) | The Sale Order will provide for a release of the Debtors from amounts due and owing first under the DIP Documents and second, under the Loan & Notes Documents up to an amount equal to the Credit Bid Amount that is applicable thereto in accordance with the second sentence of Section 3.2(a) of the Stalking Horse APA. The Stalking Horse APA does not provide for any other releases of claims against any entity. In addition, it is not contemplated that the Sale Order will provide for any other releases of claims against any entity.<br><br>(Definition "Sale Order" in the Stalking Horse APA) |
| **Private Sale/No Competitive Bidding**<br><br>Del. Bank. L.R. 6004-1(b)(iv)(D) | The Bidding Procedures contemplate a public auction process. |
| **Closing and Other Deadlines**<br><br>Del. Bank. L.R. 6004-1(b)(iv)(E) | Section 7.2 of the Stalking Horse APA contains the following milestones:<br><br>(a)    On the Petition Date, the Debtors shall file (i) a motion with the Bankruptcy Court seeking approval of the DIP Facility and (ii) the Bidding Procedures Motion.<br><br>(b)    On or before the date that is two (2) business days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order.<br><br>(c)    On or before the date that is twenty-one (21) days after the Petition Date, the Bankruptcy Court shall have approved the Bidding Procedures.<br><br>(d)    On or before the date that is thirty (30) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order. |

| | |
|---|---|
| | (e)    On or before the date that is fifty-six (56) days after the Petition Date, the Bid Deadline shall have occurred.<br><br>(f)    On or before the date that is fifty-eight (58) days after the Petition Date, the Debtors shall have commenced the Auction, if necessary.<br><br>(g)    On or before the date that is sixty (60) days after the Petition Date, a hearing shall have occurred in the Bankruptcy Court to consider approval of the APA and the Transaction, or another alternative transaction pursuant to the Bidding Procedures.<br><br>(h)    On or before the date that is sixty (60) days after the Petition Date, the Bankruptcy Court shall have entered the Sale Order.<br><br>(i)    On or before the date that is seventy (70) days after the Petition Date, the Closing shall have occurred. |
| **Good Faith Deposit**<br><br>Del. Bank. L.R. 6004-1(b)(iv)(F) | The Stalking Horse APA does not contemplate the Stalking Horse Bidder providing a deposit. |
| **Interim Arrangements with Proposed Buyer**<br><br>Del. Bank. L.R. 6004-1(b)(iv)(G) | At this time, it is not contemplated that the Debtors will enter into any interim agreements or arrangements with the Stalking Horse Bidder other than certain operational covenants pending the Closing, as set forth in Section 6.1 of the Stalking Horse APA. |
| **Use of Proceeds**<br><br>Del. Bank. L.R. 6004-1(b)(iv)(H) | The Debtors do not propose to release sale proceeds on or after the closing without further Court order, or to provide for a definitive allocation of sale proceeds between or among various sellers or collateral. |
| **Tax Exemption**<br><br>Del. Bank. L.R. 6004-1(b)(iv)(I) | The Sale Order will waive in all necessary jurisdictions (i) the so-called "bulk sales," "bulk transfer" and similar Laws, including those related to Taxes and (ii) the imposition of any Taxes incurred in connection with the Transactions and the Sale Order<br><br>(Definition of "Sale Order" in the Stalking Horse APA) |
| **Record Retention** | The Debtors will have reasonable access to their books and records to enable them to administer their bankruptcy cases. |

| | |
|---|---|
| Del. Bank. L.R. 6004-1(b)(iv)(J) | (Section 6.3 of the Stalking Horse APA) |
| **Sale of Avoidance Actions**<br><br>Del. Bank. L.R. 6004-1(b)(iv)(K) | The Stalking Horse Bidder is acquiring all of the Purchased Actions. "Purchased Actions" include all causes of action, lawsuits, Claims, rights of recovery and other similar rights of any Seller, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law in equity or otherwise (including any derivative Claims asserted or that may be asserted on behalf of any Debtor) against any current or former officer or director of any Debtor or any shareholder of any Debtor or the Representatives of any Debtor. In addition, the Stalking Horse Bidder is acquiring all Claims with respect to the Business, including all Avoidance Actions, other than Claims that are Excluded Assets.<br><br>(Section 2.1(d) and Section 2.1(f) of the Stalking Horse APA) |
| **Requested Findings as to Successor Liability**<br><br>Del. Bank. L.R. 6004-1(b)(iv)(L) | The Stalking Horse APA requires that the Sale Order approving the sale will provide that neither Stalking Horse Bidder nor any of its Affiliates or equityholders will have any derivative, successor, transferee or vicarious liability of any kind or character, whether fixed or contingent, for Liabilities of the Debtors (whether under federal or state Law or otherwise), including on account of any Taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Business prior to the Closing. The Stalking Horse Bidder is also not assuming any liabilities of the Debtors other than specifically enumerated list of Assumed Liabilities.<br><br>(Definition of "Sale Order" in the Stalking Horse APA; Section 2.4 of the Stalking Horse APA) |
| **Sale Free and Clear of Unexpired Leases**<br><br>Del. Bank. L.R. 6004-1(b)(iv)(M) | Not applicable. |
| **Credit Bid**<br><br>Del. Bank. L.R. 6004-1(b)(iv)(N) | At the Auction, if any, any Qualified Bidder who has a valid and perfected lien on any assets of the Debtors' estates (a "Secured Creditor"), whether or not such liens remain subject to any challenge period as set forth in any DIP Order, shall be permitted to submit a credit bid for all or a portion of the assets subject to such lien, up to the amount of such Secured Creditor's claims (a "Credit Bid") to the extent permitted under section 363(k) of the Bankruptcy Code, as it relates to the Debtors; *provided, however*, that any Secured Creditor, other than the |

11

| | |
|---|---|
| | Administrative Agent and the DIP Agent, that intends to participate in the Auction with a Bid that includes a Credit Bid shall, as a condition to such participation, (i) notify the Debtors at least five (5) calendar days prior to the Bid Deadline that it intends to submit a Credit Bid, and (ii) provide all documentation requested by the Debtors to establish the lien, claims, and encumbered assets that will be the subject of the Secured Creditor's potential Credit Bid. |
| | The Stalking Horse Bidder shall be permitted to increase its Credit Bid up to the full amount of its applicable outstanding secured obligations.  For purposes of valuing Competing Qualified Bids and determining the Successful Bid, the full face amount of a Credit Bid satisfying the requirements set forth in the Bidding Procedures and the Bidding Procedures Order shall be deemed to have the same value as the equivalent amount of cash.  Subject to each Bid and Qualified Bid satisfying the requirements of these Bidding Procedures, the Debtors shall treat comparable Credit Bids and cash bids as equivalent and no Credit Bid shall be considered inferior to a cash bid merely because it is a Credit Bid.  Notwithstanding anything to the contrary, but subject in all respects to the challenge period as set forth in any DIP Order, the Administrative Agent and the DIP Agent shall each have the right to Credit Bid all or any portion of the aggregate amount of their applicable outstanding secured obligations, notwithstanding any earlier or lower Credit Bid of any portion of their applicable outstanding secured obligations.  (Bidding Procedures Order, para. 8; Bidding Procedures Section F). |
| **Relief From Bankruptcy Rule 6004(h)**<br><br>Del. Bank. L.R. 6004-1(b)(iv)(O) | The Debtors request that the court waive the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  (Bidding Procedures Motion, para. 50).<br><br>(Definition of "Sale Order" in the Stalking Horse APA) |

**Proposed Bidding Procedures**

17.     The Bidding Procedures are attached to the Bidding Procedures Order as **Exhibit 1**.

The Bidding Procedures are summarized as follows:

(a)     Assets to be Sold.  All or substantially all of the Debtors' assets.

(b)      Potential Bidders.  Any person interested in participating in the bidding process for all or a portion of the Company Assets (each a "Potential Bidder") must satisfy the requirements set forth in the Bidding Procedures.

(c)      Qualified Bidders.  A "Qualified Bidder" is a Potential Bidder (i) that provides documentation demonstrating the financial capability to consummate the Sale in the form of cash on hand or unconditional committed financing (as determined by the Debtors after consultation with the Consultation Parties (as defined below)), (ii) whose bid is submitted in writing and satisfies each of the requirements (the "Bid Requirements"), as determined by the Debtors, after consultation with the Consultation Parties, and (iii) that the Debtors, in consultation with the Consultation Parties, determine should be considered a Qualified Bidder (such a bid by a Qualified Bidder, a "Qualified Bid").  Within one (1) business days after the Bid Deadline, the Debtors' advisors will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder.  The Stalking Horse Bidder, the Administrative Agent, and the DIP Agent shall each be deemed a Qualified Bidder for all purposes under the Bidding Procedures and at all times, and the Stalking Horse Bid shall be deemed a Qualified Bid for all purposes under the Bidding Procedures and at all times.

(d)      Bidding Process.  The Debtors and their advisors, in consultation with (a) the counsel for the committee of unsecured creditors (the "Committee"), if any; (b) the Prepetition Secured Parties and their counsel and financial advisors; and (c) the agent and lenders under the Debtors' proposed postpetition financing (the "DIP Agent" and the "DIP Lenders," respectively) and their counsel and financial advisors (collectively, the "Consultation Parties"),

13

shall: (i) determine whether a Potential Bidder is a Qualified Bidder; (ii) coordinate the efforts of Potential Bidders in conducting their due diligence investigations, as permitted by the provisions of the Bidding Procedures; (iii) receive offers from Qualified Bidders; and (iv) negotiate any offers made to purchase the Company Assets.  The Debtors may adopt rules for the Auction at or prior to the Auction that, in their reasonable discretion, will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bidding Procedures Order and the Bankruptcy Code.  Counsel and financial advisors to the Prepetition Secured Parties, the DIP Lenders and/or the DIP Agent shall remain Consultation Parties until another Qualified Bid is received and the Stalking Horse Bidder intends to participate in the Auction as a bidder.

     (e)    <u>Bid Deadline</u>.  The Debtors propose that the deadline for submitting bids by a Potential Bidder shall be **<u>July 26, 2021 by 11:59 a.m. (prevailing Eastern time)</u>** (the "<u>Bid Deadline</u>").  On or before the Bid Deadline, a Potential Bidder that desires to make an offer, solicitation or proposal (a "<u>Bid</u>") shall deliver written copies of its Bid to the Debtors' investment banker, SSG Advisors, LLC, 300 Barr Harbor Drive, Suite 420, West Conshohocken, Pennsylvania 19428, Attn: J. Scott Victor, jsvictor@ssgca.com, with copies to proposed counsel for the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 N. Market St., 17th Floor, Wilmington, Delaware  19801, Attn: Laura Davis Jones, Esq., ljones@pszjlaw.com, and Chapman and Cutler LLP, 1270 Avenue of the Americas, New York, New York 10020, Attn: Larry G. Halperin, Esq., halperin@chapman.com.  A Bid received after the Bid Deadline shall not constitute a Qualified Bid.

(f)    Bid Requirements.  The Debtors propose that, to be eligible to participate in the Auction, each Bid and each Potential Bidder submitting such a Bid must satisfy each of the following conditions, unless waived or modified by the Debtors in their discretion in consultation with the Consultation Parties:

(1)    Assets.  Each Bid must clearly state that it is acquiring all or substantially all of the Company Assets and which Company Assets (if any) are excluded from the Bid.

(2)    Assumption of Obligations.  Each Bid must clearly state which liabilities and obligations of the Debtors the Qualified Bidder is agreeing to assume.

(3)    Purchase Price.  Each Bid must clearly set forth the cash purchase price to be paid for the Company Assets being purchased, including the allocation of responsibility for the payment of any cure costs and otherwise identifying separately any cash and non-cash components, which non-cash components shall be limited only to credit-bids and assumed liabilities (the "Bid Purchase Price").

(4)    Minimum Bid.  At a minimum, each Bid must have a cash Bid Purchase Price that is equal to or is greater than the Purchase Price (as defined in the Stalking Horse APA) plus $250,000 in cash (the "Minimum Cash Bid Amount").

(5)    Markup of the Stalking Horse APA.  Each Bid must be accompanied by a duly authorized and executed asset purchase agreement (each, a "Purchase Agreement"), an electronic copy of such Purchase Agreement in Microsoft Word format, and a redline of such Purchase Agreement marked to reflect the amendments and modifications made to the form of the Stalking Horse APA provided by the Debtors to Potential Bidders.  Each such Purchase Agreement must provide for (i) payment in cash at closing of the Bid Purchase Price, including an amount no less than the Minimum Cash Bid Amount, and (ii) a representation that the Qualified Bidder will make all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), if applicable, and submit and pay the fees associated with all necessary filings under the HSR Act as soon as reasonably practicable; provided, however, that the timing and likelihood of receiving HSR Act approval will be a consideration in determining the highest or otherwise best Bid.

(6)   Deposit.  Each Bid, other than the Stalking Horse Bid, must be accompanied by a cash deposit in the amount equal to ten percent (10%) of the aggregate Bid Purchase Price (which shall be no less than the Minimum Cash Bid Amount), to be held in an escrow account to be identified and established by the Debtors (the "Deposit").  The Stalking Horse Bidder shall not be required to submit a Deposit.

(7)   Qualified Bid Documents.  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid and shall include a schedule of assumed contracts to the extent applicable to the Bid, and a copy of the Purchase Agreement clearly marked to show all changes requested by the Qualified Bidder, including those related to the respective Bid Purchase Price and assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such bid (the "Qualified Bid Documents").

(8)   Committed Financing.  To the extent that a Bid is not accompanied by evidence of the Qualified Bidder's capacity to consummate the sale set forth in its Bid with cash on hand, each Bid must include unconditional committed financing from a reputable financing institution, executed and documented to the satisfaction of the Debtors in consultation with the Consultation Parties, that demonstrates that the Qualified Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the Qualified Bidder's Bid Purchase Price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the applicable Company Assets and the proposed transactions.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors, in consultation with the Consultation Parties.

(9)   Contingencies; No Financing or Diligence Outs.  A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions, which shall be acceptable to the Debtors in their business judgment, after consultation with the Consultation Parties.

(10)   Identity.  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each Bid Sponsor, if such Qualified Bidder is an entity formed for the purpose of consummating the proposed transaction contemplated by such Bid), and Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each Bid Sponsor, if such Qualified Bidder is an entity formed

16

for the purpose of consummating the proposed transaction contemplated by such Bid), and the complete terms of any such participation. Each Bid must also fully disclose whether any current or former officer, director or equity holder of the Debtors, or any entity affiliated with any current or former officer, director or equity holder of the Debtors, will be bidding or otherwise participating in connection with such Bid, including any employment or compensation arrangements being negotiated or agreed to between the Qualified Bidder and any employee of the Debtors. Under no circumstances shall any undisclosed insiders, principals, equity holders, or financial backers of the Debtors be associated with any Bid (including any Overbid at the Auction). Each Bid must also include contact information for the specific persons and counsel whom the Debtors and their advisors should contact regarding such Bid.

(11)    Adequate Assurance of Future Performance.    Each Bid must (i) identify the executory contracts and unexpired leases to be assumed and assigned in connection with the proposed Sale (the "Assumed Contracts"), and (ii) demonstrate, in the Debtors' reasonable business judgment, after consultation with the Consultation Parties, that the Qualified Bidder can provide adequate assurance of future performance under all such executory contracts and unexpired leases. To the extent applicable, each Bid must contain evidence that the Potential Bidder has the ability to comply with the requirements of adequate assurance of future performance under section 365(b)(1) of the Bankruptcy Code (the "Adequate Assurance Information") with respect to the Assumed Contracts.    Such Adequate Assurance Information may include:  (i) information about the Potential Bidder's financial condition, such as federal tax returns for two (2) years, a current financial statement, or bank account statements; (ii) information demonstrating (as determined by the Debtors in the reasonable exercise of their business judgment (in consultation with the Consultation Parties)) that the Potential Bidder has the financial capacity to consummate the proposed transaction and perform its obligations under the contracts and leases after consummating the proposed transaction; (iii) evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with respect to the submission of its Bid; (iv) the identity and exact name of the Potential Bidder (including any equity holder or other financial backer if the Potential Bidder is an entity formed for the purpose of consummating the proposed transaction); (v) such additional information regarding the Potential Bidder as the Potential Bidder may elect to include; and (vi) such other documentation that the Debtors may request. By submitting a Bid, the Potential Bidder(s) agree that the Debtors may disseminate, following the Auction, their Adequate Assurance Information to affected landlords and contract counterparties in the event that the Debtors determine such Bid to be a Qualified Bid.

(12)    Affirmative Statement.  Each Bid shall be accompanied by an affirmative binding statement in which the Potential Bidder explicitly agrees that: (i) it has had an opportunity to conduct any and all due diligence regarding the Company Assets prior to making its offer; (ii) it has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or such assets in making its Bid; (iii) it did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the applicable Company Assets or the completeness of any information provided in connection therewith or the Auction, except those expressly stated in the competing Purchase Agreement; (iv) it has and will continue to comply with the Bidding Procedures; (v) the Bid it submits does not entitle such Potential Bidder (and if it becomes a Qualified Bidder) to any break-up fee, expense reimbursement, termination payment, or similar type of payment or reimbursement; and (vi) it waives any substantial contribution administrative expense claims under Bankruptcy Code section 503(b) related to bidding for the Company Assets.

(13)    Time Frame for Closing.  A Bid by a Qualified Bidder must be reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors after consultation with the Consultation Parties, which time frame shall include a closing by no later than August 9, 2021.

(14)    Binding and Irrevocable.  A Qualified Bidder's Bid for the applicable Company Assets shall be irrevocable unless and until the Debtors notify such Qualified Bidder that such Bid has not been approved as a Successful Bid or a Backup Bid at the Sale Hearing.

(15)    Expenses; Disclaimer of Fees.  Each Bid must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no Qualified Bidder will be permitted to request at any time, whether as part of the Auction, if any, or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

(16)    Authorization.  Each Bid must contain evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors, in consultation with the Consultation Parties) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

(17)    <u>Adherence to Bidding Procedures</u>.  By submitting a Bid, each Qualified Bidder is agreeing, and shall be deemed to have agreed, to abide by and honor the terms of the Bidding Procedures and after the conclusion of the Auction, if any, agrees not to submit a Bid, or seek to reopen the Auction.

(18)    <u>Government Approvals</u>.  Each Bid must include a description of all governmental, licensing, regulatory, or other approvals or consents that are required to close the proposed Sale, together with evidence satisfactory to the Debtors, after consultation with the Consultation Parties, of the ability to obtain such consents or approvals in a timely manner, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such consents or approvals.

(19)    <u>Government Approvals Timeframe</u>.  Each Bid must set forth an estimated timeframe for obtaining any required, governmental, licensing, regulatory or other approvals or consents for consummating any proposed Sale.

(20)    <u>Consent to Jurisdiction</u>.  By submitting a Bid, each Qualified Bidder agrees and shall be deemed to have agreed, to submit to the jurisdiction of the Bankruptcy Courts and waives any right to a jury trial in connection with any disputes relating to the Debtors' qualification of bids, the Auction, if any, the construction and enforcement of the Bidding Procedures, the Sale documents, and the closing of the sale transaction, as applicable.

(21)    <u>Bid Deadline.</u>  Each Bid must be transmitted via email (in electronic format) so as to be **actually received** on or before **July 26, 2021 by 11:59 a.m. (prevailing Eastern Time)** by the Debtors' Financial Advisors, SSG Advisors, LLC, 300 Barr Harbor Drive, Suite 420, West Conshohocken, Pennsylvania 19428, Attn: J. Scott Victor, jsvictor@ssgca.com, with copies to proposed counsel for the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 N. Market St., 17th Floor, Wilmington, Delaware 19801, Attn: Laura Davis Jones, Esq., ljones@pszjlaw.com, and Chapman and Cutler LLP, 1270 Avenue of the Americas, New York, New York 10020, Attn: Larry G. Halperin, Esq., halperin@chapman.com.

(g)    <u>Qualified Bids</u>.  The Debtors propose that a Bid received before the Bid Deadline that meets the above requirements and that satisfies the Bid Deadline requirement above shall constitute a "<u>Qualified Bid</u>," if the Debtors believe, in their reasonable discretion, that such Bid would be consummated if selected as the Successful Bid.  The Debtors shall have the right to

reject any and all bids that they believe, in their reasonable discretion, do not comply with the Bidding Procedures. If no Qualified Bids other than the Stalking Horse Bid are received in accordance with the Bidding Procedures, then the Debtors may decide, in consultation with the Consultation Parties, to cancel the Auction and designate the Stalking Horse Bid as the Successful Bid and pursue entry of the orders approving a Sale of the Company Assets to the Stalking Horse Bidder pursuant to the Stalking Horse APA.

(h)     Right to Credit Bid. At the Auction, if any, any Qualified Bidder who has a valid and perfected lien on any assets of the Debtors' estates (a "Secured Creditor"), whether or not such liens remain subject to any challenge period as set forth in any order approving postpetition financing for the Debtors, shall be permitted to submit a credit bid for all or a portion of the assets subject to such lien, up to the amount of such Secured Creditor's claims (a "Credit Bid"), to the extent permitted under section 363(k) of the Bankruptcy Code, as it relates to the Debtors; *provided, however,* that any Secured Creditor, other than the Administrative Agent and the DIP Agent, that intends to participate in the Auction with a Bid that includes a Credit Bid shall, as a condition to such participation, (i) notify the Debtors at least five (5) calendar days prior to the Bid Deadline that it intends to submit a Credit Bid, and (ii) provide all documentation requested by the Debtors to establish the lien, claims, and encumbered assets that will be the subject of the Secured Creditor's potential Credit Bid. Notwithstanding anything to the contrary contained herein, the Administrative Agent and the DIP Agent shall have the right to Credit Bid all or any portion of the aggregate amount of their respective applicable outstanding secured obligations,

notwithstanding any earlier or lower Credit Bid of any portion of their respective applicable outstanding secured obligations.

      (i)    <u>Bid Assessment Criteria</u>. The Debtors shall evaluate all Qualified Bids and identify the Qualified Bid that is, in the Debtors' judgment, after consultation with the Consultation Parties, the highest or otherwise best Qualified Bid for the Company Assets (the "<u>Baseline Bid</u>"), and provide copies of the applicable Qualified Bid Documents supporting the Baseline Bid to each Qualified Bidder prior to the Auction. When determining the highest or otherwise best Qualified Bid(s) and selecting the winning bidder, as compared to other Qualified Bids, the Debtors may, in consultation with the Consultation Parties, consider the following factors in addition to any other factors that the Debtors deem appropriate:

    (1)    the number, type, and nature of any changes to the Stalking Horse APA, if any, requested by the Qualified Bidder, including the type and amount of assets sought and obligations to be assumed in the Qualified Bid;

    (2)    the amount and nature of the total consideration;

    (3)    the likelihood of the Qualified Bidder's ability to close the Sale and the timing thereof;

    (4)    the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents;

    (5)    the tax consequences of such Qualified Bid;

    (6)    the impact on employees, including the number of employees proposed to be transferred and whether the bid includes an assumption of the Debtors' prepetition collective bargaining agreements, defined benefit and defined contribution pension plans;

    (7)    the assumption of liabilities, including obligations under contracts and leases;

21

    (8)  the cure amounts to be paid; and

    (9)  the nature of any regulatory authorizations required (collectively, items (1) through (9) hereof, the "Bid Assessment Criteria").

  (j)  Auction.    The Debtors and theirs advisors, in consultation with the Consultation Parties, will conduct the Auction to determine the highest or best Bid with respect to the Company Assets.

    (1)  Unless otherwise designated by the Debtors, the Debtors propose that the Auction, if any, shall take place virtually at **July 28, 2021 at 10:00 a.m. (prevailing Eastern Time)**, or such later date and time as selected by the Debtors after consultation with the Consultation Parties.

    (2)  In advance of the Auction, the Debtors will notify all Qualified Bidders of the Baseline Bid, as determined by the Debtors in their discretion.

    (3)  Only (A) Qualified Bidders (including the Stalking Horse Bidder) and their legal and financial advisors, (B) the Consultation Parties and their legal and financial advisors, (C) the U.S. Trustee, and (D) actual creditors of the Debtors (provided that they give at least two (2) business days' notice to the Debtors' counsel of their intention to attend the Auction), shall be entitled to attend the Auction, if any, and the Qualified Bidders shall appear at the Auction and may speak or bid themselves or through duly authorized representatives.

    (4)  During the Auction, bidding shall begin initially with the Baseline Bid, which may be the Bid of the Stalking Horse Bidder, and subsequently continue with a value that exceeds the value of the consideration under the Baseline Bid(s) by an incremental amount that is not less than $250,000 (as applicable, the "Minimum Overbid Increment"), and successive overbids ("Overbids") shall be higher than the Prevailing Highest Bid (as defined below) by at least the Minimum Overbid Increment.

    (5)  The Debtors reserve the right, in consultation with the Consultation Parties, to announce reductions or increases in the Minimum Overbid Increment at any time during the Auction, if any. Additional consideration in excess of the amount set forth in the respective Baseline Bid or Prevailing Highest Bid may include: (a) cash; (b) assumption of liability, which shall be ascribed a value by the Debtors, in consultation with the Consultation Parties, in determining whether the Minimum Overbid Increment has been met; and (c) in the case of a Bid by a Secured Creditor, a credit bid of up to

the full amount of such Secured Creditor's allowed secured claim pursuant to section 363(k) of the Bankruptcy Code.

(6)     Upon the solicitation of each round of applicable Overbids, the Debtors may announce a deadline (as the Debtors may, in their business judgment, after consultation with the Consultation Parties, extend from time to time, the "Overbid Round Deadline") by which time any Overbids must be submitted to the Debtors.

(7)     An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid so long as, after giving effect to the same, the terms of the Overbid are no less favorable to the Debtors' estates than any prior Bid or Overbid of such Qualified Bidder, as determined in the Debtors' reasonable business judgment after consultation with the Consultation Parties, and shall otherwise comply with the terms of the Bidding Procedures.

(8)     Subsequent to each Overbid Round Deadline, the Debtors, shall announce whether the Debtors have identified in the applicable Overbid round, an Overbid (or combination of Overbids) as being higher or otherwise better than, in the Overbid round, the Baseline Bid plus the Minimum Overbid Increment, or in subsequent rounds, the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid (the "Prevailing Highest Bid"). The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid as well as the value attributable by the Debtors to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.

(9)     Additional provisions regarding the conduct of the Auction are set forth in the Bidding Procedures.

(10)     The Auction, if any, shall continue until there is one Bid (or a combination of Bids) for the Company Assets that the Debtors determine, in their reasonable business judgment, after consultation with the Consultation Parties, to be the highest or otherwise best Bid (or Bids) for the Company Assets. Such Bid(s) shall be declared the "Successful Bid" and such Qualified Bidder(s), the "Successful Bidder," at which point the Auction will be closed. The Auction, if any, shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid. Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Bankruptcy Courts of the Successful Bid.

(k)    <u>Acceptance of Successful Bid</u>.  The Debtors shall sell the Company Assets to the Successful Bidder upon the approval of the Successful Bid by the Bankruptcy Court after the Sale Hearing.  In the event the transaction does not close with the Successful Bidder, the Debtors shall be authorized to sell the Company Assets to the Backup Bidder (as defined below). The Debtor's presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Debtor's acceptance of such Qualified Bid.  The Debtors will be deemed to have accepted a Qualified Bid only when the Qualified Bid has been approved by the Bankruptcy Court at the Sale Hearing.

(l)    <u>Back-up Bidder</u>.  If an Auction is conducted for the Company Assets, the Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction for the applicable Company Asset(s) (the "<u>Backup Bid</u>"), as determined by the Debtors in the exercise of their reasonable business judgment, shall be required to serve as a backup bidder (the "<u>Backup Bidder</u>") for such Company Assets, and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors.

**<u>Sale Hearing</u>**

18.    The Debtors request that the Court schedule the Sale Hearing on **[<u>July 30, 2021 at 10:00 a.m.] (prevailing Eastern time)</u>**, in order to allow for entry of a sale order and closing of the sale by no later than **<u>August 9, 2021,</u>** and that objections, if any, to the Sale Order be filed no later than **<u>July 29, 2021 at 5:00 p.m. (prevailing Eastern time)</u>**.

**Notice of Sale Hearing**

19.     The Debtors request that the Court approve the Notice of Auction and Sale Hearing, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2**, which the Debtors will serve on the following parties:

(a)     the Office of the United States Trustee for the District of Delaware;

(b)     counsel for the Stalking Horse Bidder, DIP Agent and the Administrative Agent, (i) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: David N. Griffiths, Esq. (david.griffiths@weil.com) and Bryan R. Podzius, Esq. (bryan.podzius@weil.com)) and (ii) Richards, Layton & Finger, P.A., 920 N. King St., Wilmington, Delaware 19801 (Attn: Zachary I. Shapiro, Esq. (shapiro@rlf.com));

(c)     if any statutory committee has been appointed in the Chapter 11 Cases, counsel to such Committee;

(d)     the Non-Debtor Counterparties to the Available Contracts;

(e)     the attorneys general in the State(s) where the Company Assets are located;

(f)     all state and local taxing authorities in the State(s) where the Company Assets are located;

(g)     the Internal Revenue Service;

(h)     all parties that have asserted liens against the Company Assets;

(i)     the United States Attorney for the District of Delaware and the district(s) where the Company Assets are located;

(j)     all parties that are entitled to notice pursuant to Bankruptcy Rule 2002; and

25

(k)    all known creditors of the Debtors (collectively, the "Sale and Bidding Procedures Notice Parties").

20.    The Debtors propose to serve the Notice of Auction and Sale Hearing substantially in the form attached to the Bidding Procedures Order as **Exhibit 2** within two (2) Business Days from the date of entry of an order granting this Motion, by either email or first-class mail on the appropriate parties as described above. The Notice of Auction and Sale Hearing will provide that any party that has not received a copy of the Bidding Procedures Order that wishes to obtain a copy of such document may make such a request, in writing, to Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box, 8705, Wilmington, Delaware, 19899-8705 (Courier 19801) (Attn: Laura Davis Jones, Esq., ljones@pszjlaw.com).

21.    Additionally, the Debtors propose to post the Notice of Auction and Sale Hearing and the Bidding Procedures Order (the form of which is attached to the Bidding Procedures Order as **Exhibit 2**), on the website of the Debtors' claims and noticing agent.

### Sale Hearing

22.    At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the sale of the Company Assets to the Successful Bidder, free and clear of all liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code with all such liens, claims and interests to attach to the proceeds of the sale, except as otherwise provided with the same validity and in the same order of priority as they attached to the Company Assets prior to the sale, including the assumption by the Debtors and assignment to the Successful Bidder of the Assumed Contracts pursuant to section 365 of the Bankruptcy Code. The Debtors will present additional evidence, as

necessary, at the Sale Hearing and submit that the relief sought herein, including the sale and related assumption and assignment of contracts and leases, is fair, reasonable and in the best interest of the Debtor's estate.

### Post-Auction Objections

23.    The Debtors request that the court set a deadline for parties seeking to object only to (i) the conduct at the Auction (if held) or (ii) solely with respect to the Non-Debtor Counterparties to the Contracts, to the specific identity of and adequate assurance of future performance provided by the Successful Bidder (only if such Successful Bidder is not the Stalking Horse Bidder) (such a limited objection, a "Post-Auction Objection") at **5:00 pom (prevailing Eastern Time) on July 29, 2021** (the "Post-Auction Objection Deadline").

### Closing

24.    The closing shall take place in accordance with terms of an agreement approved by the Bankruptcy Court at the Sale Hearing.

### Procedures for the Assumption and Assignment of Assumed Contracts

25.    At the closing, the Debtor may seek to assume and assign to the Successful Bidder, certain executory contracts (the "Available Contracts").[3]  The list of the Assumed Contracts will be attached to the Agreement accompanying a Qualified Bid, provided, however, that the Successful Bidder may add to the list of Assumed Contracts (so long as the Debtor files and serves the Cure Notice on each affected contract counterparty within ten (10) calendar days before the

---

[3]    The inclusion of any agreement in the list of Assumed Contracts does not constitute an admission by the Debtor that such agreement actually constitutes an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and the Debtor expressly reserves the right to challenge the status of any agreement included in the list of Assumed Contracts.

Sale Hearing), and may remove any executory contract or lease to the list of Assumed Contracts at any time prior to the closing of the sale.

26.      No later than three (3) business days after entry of the Bidding Procedures Order, the Debtors propose to file with this Court and serve the Assumption Notice on each Non-Debtor Counterparty to each of the Available Contracts.  The Assumption Notice also will identify the amounts, if any, that the Debtors believes are owed to each counterparty to an Assumed Contract in order to cure any defaults that exist under such contract (the "Cure Amounts").  The Debtors propose that the Assumption Notice will state the date by which any objection to the Cure Amounts or the assumption and assignment of the Assumed Contract (including with respect to adequate assurance of future performance) (a "Cure/Assignment Objection") must be filed and served, which the Debtors propose to be **July 5, 2021 at 5:00 p.m. (prevailing Eastern time)**.  If a contract is assumed and assigned pursuant to the Bankruptcy Court's order approving same, then unless the affected counterparty properly files and serves an objection to the Cure Amounts contained in the Assumption Notice, the counterparty will receive at the time of the closing (or as soon as reasonably practicable thereafter), the Cure Amounts as set forth in the Assumption Notice, with payment made pursuant to the terms of the Asset Purchase Agreement accompanying a Qualified Bid, or the agreement of the Successful Bidder.  If an objection is filed by a counterparty to an Assumed Contract with respect to the amount of the Cure Amounts set forth in the Assumption Notice, the Debtors propose that such objection must set forth a specific default under the Assumed Contract and claim a specific monetary amount that differs from the amount (if any) specified by the Debtors in the Assumption Notice or, alternatively, state why the counterparty

28

believes any Cure Amounts are owing, and state the basis for any other objection to the assumption and assignment of the Assumed Contract.

27.     The Successful Bidder shall be responsible for satisfying any requirements regarding adequate assurances of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assumed Contracts. The Debtors propose that the Court make its determinations concerning adequate assurance of future performance under the Assumed Contracts pursuant to section 365(b) of the Bankruptcy Code at the Sale Hearing. The Debtors further propose that Cure Amounts disputed by any counterparty will be resolved by the Court at the Sale Hearing.

28.     Except to the extent otherwise provided in the agreement entered into with the Successful Bidder(s), subject to the payment of any Cure Amounts, the assignee of an Assumed Contract will not be subject to any liability to the assigned contract counterparty that accrued or arose before the closing date of the sale of the Company Assets and the Debtors shall be relieved of all liability accruing or arising thereafter pursuant to 11 U.S.C. § 365(k).

<u>**Approval of the Relief Requested is Warranted and Appropriate**</u>

A.     **The Bidding Procedures are Fair and Reasonable**

29.     The Bidding Procedures are designed to promote the paramount goal of any proposed sale of property of a debtor's estate: maximizing the value of sale proceeds received by the estate. *See Burtch v. Ganz, et al. (In re Mushroom Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor had fiduciary duty to maximize and protect value of estate's assets); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (recognizing that main goal of any

proposed sale of property of a debtor's estate is to maximize value). Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing value of a debtor's estate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing that sale procedures "encourage bidding and . . . maximize the value of the debtor's assets").

30.     The Bidding Procedures provide for an orderly, uniform, and competitive process through which interested parties may submit offers to purchase the Debtors' business. The Debtors, with the assistance of their advisors, have structured the Bidding Procedures to promote active bidding by interested parties and to reach the highest or otherwise best offer reasonably available for the Debtors' business. The Stalking Horse Bidder will be the stalking horse for competitive bids, leading to further competition and the establishment of a baseline against which higher or otherwise better offers can be measured. Further, no break-up fees or other bidding incentives are being provided to the Stalking Horse Bidder. Additionally, the Bidding Procedures will allow the Debtors to conduct the Auction, if necessary, in a fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to timely consummate a sale transaction. The Bidding Procedures provide the Debtors with an adequate opportunity to consider competing bids and to select the highest or otherwise best offers for the completion of a sale transaction.

30

**B.      Assumption and Assignment of Assumed Contracts Should be Approved**

31.      Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Upon finding that a debtor has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code.  *See, e.g., In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court"); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject executory contract is governed by business judgment standard and may only be overturned if decision is product of bad faith, whim, or caprice).  The "business judgment" test in this context only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate.  *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989).

32.      The contemplated assumption of the Assumed Contracts in connection with a sale transaction is an exercise of the Debtors' sound business judgment because the Assumed Contracts are necessary to operate the Debtors' business and, as such, are essential to obtaining the highest or otherwise best offer for the Debtors' business.  Moreover, the Assumed Contracts will be assumed and assigned in accordance with the procedures for assumption and assignment approved by the Court pursuant to the Bidding Procedures Order, which will be reviewed by the Debtors' key stakeholders.  Accordingly, the Debtors' assumption of the Assumed Contracts is an exercise of sound business judgment and should be approved.

33.    The consummation of a sale transaction, which will involve the assignment of the Assumed Contracts, will be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code.  Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assumed Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured.  As set forth above, the Debtors propose to file with the Court and serve on each counterparty to an Assumed Contract, a notice indicating the Debtors' calculation of the Cure Amount for each such contract.  The counterparties will have the opportunity to file objections to the proposed assumption and assignment of the Assumed Contracts to the Successful Bidder, including the proposed Cure Amounts.  Failure to object to the Cure Amount will result in the Cure Amount being binding on the counterparties to the Assumed Contract.

34.    Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided."  11 U.S.C. § 365(f)(2)(B).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall

32

considerably short of an absolute guarantee of performance."). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

35.     As set forth in the Bidding Procedures, for a bid to qualify as a "Qualified Bid," a Potential Bidder must provide information regarding its ability (and the ability of its designated assignee, if applicable) to perform under the Assumed Contracts (the "Adequate Assurance Information"). The Debtors will provide Adequate Assurance Information to all counterparties to the Assumed Contracts and counterparties will have an opportunity to file an objection in advance of the Sale Hearing. In addition, to facilitate the assumption and assignment of the Assumed Contracts, the Debtors further request that the Court find that all anti-assignment provisions in the Assumed Contracts, whether such provisions expressly prohibit or have the effect of restricting or limiting assignment of such contract or lease, to be unenforceable under section 365(f) of the Bankruptcy Code.[4] Based on the foregoing, the Debtors' assumption and assignment

---

[4]     Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease[.]" 11 U.S.C. § 365(f)(1). Section 365(f)(3) further provides that, "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

of the Assumed Contracts satisfies the requirements under section 365 of the Bankruptcy Code and should be approved.

36.     Accordingly, the Debtors respectfully request approval of:    (a) the Bidding Procedures for the Auction and selection of the Successful Bidder(s); (b) the procedures set forth herein for notice to counterparties under executory contracts and leases proposed to be assumed and assigned in connection with the proposed sale, and the determination and payment of Cure Amounts to the counterparties to leases or contracts to be assumed and assigned; (c) the scheduling of the Sale Hearing and other matters for which scheduling is requested herein; and (d) the related relief sought hereby.

**C.      The Proposed Sale Satisfies the Requirements of Bankruptcy Code Section 363**

37.     Ample authority exists for approval of the Sale contemplated by this Motion. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of a debtor's estate, courts have approved the authorization of a sale of a debtor's assets if the sale is based upon the sound business judgment of the debtor. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386, 389–90 (6th Cir. 1986); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).

38.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard:   (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was provided to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith.  *See In re Decora Indus., Inc.*, No. 00-4459 (JJF), 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)).   Where a debtor demonstrates a valid business justification for a decision, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. at 656.

<u>The Debtors Have Demonstrated a Sound Business Justification for the Sale</u>

39.     A sound business purpose for the sale of a debtor's assets outside the ordinary course of business exists where the sale is necessary to preserve the value of the estate for the benefit of creditors and interest holders.  *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 148 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1070–71; *In re Food Barn Stores, Inc.*, 107 F.3d at 564-65 (recognizing the paramount goal of any proposed sale of property of estate is to maximize value).

40.     A strong business justification exists for the sale of the Company Assets as described herein.  As set forth above and in the First Day Declaration, an orderly and expeditious sale of the Company Assets is critical to maximizing the value of the Debtors' estates and minimizing administrative costs.  The Debtors' management team has determined that, given the

Debtors' liquidity, the most viable path toward a global resolution of the Debtors' financial and operational challenges is through consummating a strategic sale transaction in a timely manner. This Motion is in furtherance of that strategy. Moreover, a timely closing of a sale of the Company Assets is required under the DIP Facility, without which, the Debtors would not be able to fund the sale process or continue their operations during the pendency of these chapter 11 cases.

The Noticing Procedures Are Reasonable and Appropriate

41.    Bankruptcy Rules 2002 and 6004 require the Debtors to notify creditors of the proposed sale, provide a description of the Company Assets, and disclose the time and place of the Auction, the terms and conditions of the proposed Sale, and the objection deadlines therefor. *See* Fed. R. Bankr. P. 2002(a), 2002(c), 6004(a); *see also* Local Rule 2002-1. The noticing procedures described above are reasonably calculated to provide all of the Debtors' known creditors and all other parties in interest with adequate and timely notice of, among other things, the proposed Sale, the Bidding Procedures, the Auction, and the Sale Hearing. Further, publishing the Publication Notice as described above is designed to capture any creditors and parties in interest not currently known to the Debtors. Accordingly, the Debtors request that the Court approve the noticing procedures described herein and in the Bidding Procedures Order, as well as the form of Sale Notice and Publication Notice.

The Sale Will Produce a Fair and Reasonable Purchase Price for the Assets

42.    The Debtors believe that the proposed sale process will produce a fair and reasonable purchase price for the Company Assets. The Stalking Horse APA is an offer to purchase the Company Assets for consideration that the Debtors, with the advice of the Debtors'

advisors, already have determined to be fair and reasonable. The Debtors are confident that, with

the Stalking Horse APA serving as the baseline bid, the post-petition sale process will culminate

in the Debtors obtaining the highest or otherwise best offer for the Company Assets.

> The Stalking Horse Bidder or the Successful Bidder Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code

43.    Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest

in property purchased from a debtor notwithstanding that the sale conducted under section 363(b)

is later reversed or modified on appeal. Specifically, section 363(m) of the Bankruptcy Code states

the following:

> The reversal or modification on appeal of an authorization under [section 363(b) of the Bankruptcy Code] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) of the Bankruptcy Code fosters the "policy of not only

affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to

those orders and judgments upon which third parties rely." *In re Abbotts Dairies*, 788 F.2d at 147;

*see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . .

provides that good faith transfers of property will not be affected by the reversal or modification

on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal.").

44.    While the Bankruptcy Code does not define "good faith," the Third Circuit has held

that "the phrase encompasses one who purchases in 'good faith' and for 'value.'" *In re Abbotts*

*Diaries*, 788 F.2d at 147 (to constitute lack of good faith, a party's conduct in connection with the

sale must usually amount to fraud, collusion between the purchaser and other bidders or the trustee

or an attempt to take grossly unfair advantage of other bidders); *see also In re Perona Bros., Inc.*,

186 B.R. 833, 839 (D.N.J. 1995); *In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989).

45.    In other words, a party would have to show fraud or collusion between the buyer and the debtor in possession, the trustee, or other bidders to demonstrate a lack of good faith. *See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" (quoting *In re Rock Indus. Mach. Corp.*, 572 F. 2d 1195, 1998 (7th Cir. 1978))).   Due to the absence of a bright-line test for good faith, the determination is based on the facts of each case, with a focus on the "integrity of [a bidder's] conduct in the course of the sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d at 1998).

46.    The Debtors submit that the Stalking Horse Bidder is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code.   The Debtors and the Stalking Horse Bidder have entered into the Stalking Horse APA without collusion, in good faith, and after extensive arm's-length negotiations.   The Stalking Horse Bidder and the Debtors have engaged separate counsel and other professional advisors to represent their respective interests in the negotiation of the Stalking Horse APA and in the sale process generally.   In addition, the Debtors retained SSG as independent investment banker to direct and guide the sale process.   Accordingly, to the best of the Debtors' knowledge, information and belief, no party has engaged in any conduct that would cause or permit the Stalking Horse APA to be set aside under section 363(m) of the Bankruptcy Code.

47.     Further, as set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process. Each Qualified Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding on or the sale of the Company Assets. Any asset purchase agreement with a Successful Bidder executed by the Debtors will be negotiated at arm's-length and in good faith. Accordingly, the Debtors seek a finding that any Successful Bidder (including the Stalking Horse Bidder) is a good faith purchaser and is entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

**D.     The Assets Should Be Sold Free and Clear of Liens, Claims, Interests, and Encumbrances under Section 363(f) of the Bankruptcy Code**

48.     In the interest of attracting the best offers, the Company Assets should be sold free and clear of any and all liens, claims, interests and other encumbrances, other than those obligations that are expressly assumed in the Stalking Horse Agreement or Competing Purchase Agreement, in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, interests and encumbrances attaching to the proceeds of the applicable sale. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if any one of the following conditions is satisfied:

a.     applicable non-bankruptcy law permits sale of such property free and clear of such interest;

b.     such entity consents;

c.     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

d.     such interest is in bona fide dispute; or

e.     such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions

are met, the debtor has the authority to conduct the sale free and clear of all liens."); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same). Section 363(f) of the Bankruptcy Code is supplemented by section 105(a), which provides that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]". 11 U.S.C. § 105(a); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of claims] is within the court's equitable powers when necessary to carry out the provisions of [the Bankruptcy Code].").

49.    The Debtors submit, and to the extent necessary will demonstrate at the Sale Hearing, that the sale of the Company Assets free and clear of all liens, claims, interests, and encumbrances, other than those obligations that are expressly assumed in the Stalking Horse APA or a competing purchase agreement, will satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code.  The Debtors will send the Sale Notice to any purported pre-petition lienholders with respect to the Company Assets.  If those lienholders do not object to the proposed Sale, then their consent should be presumed.  Accordingly, the Debtors request that, unless a party asserting a pre-petition lien, claim or encumbrance on any of the Company Assets timely objects to this Motion, that party shall be deemed to have consented to any Sale approved at the Sale Hearing.  *See Hargave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that by not objecting to a sale motion, a creditor is deemed to consent to the relief requested therein).  Additionally, any parties with junior liens on the Company Assets can be compelled to accept a money satisfaction of their interests, but also would be adequately protected by such liens attaching to the proceeds of the applicable Sale in the order of their respective priority.  The Debtors therefore request that the Court authorize the sale of the

Company Assets free and clear of any liens, claims, interests, and encumbrances, in accordance with section 363(f) of the Bankruptcy Code, other than those obligations that are expressly assumed in the Stalking Horse APA or competing purchase agreement, subject to any liens, claims, interests, and encumbrances attaching to the proceeds thereof in the same order of relative priority, with the same validity, force, and effect as they existed prior to the sale.

### Bankruptcy Rule 6004(a) and (h)

50.    To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and waive the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). The Debtors have filed this Motion and requested a hearing consistent with the notice required by the Bankruptcy Rules and Local Rules, and therefore submit that the Debtors has satisfied the notice requirements of Bankruptcy Rule 6004(a). An expeditious sale process is crucial to the Debtors' success in these chapter 11 cases to maximize value and minimize administrative costs. Accordingly, cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent those requirements apply.

### Bankruptcy Rule 6006(d)

51.    To implement the foregoing successfully, the Debtors request that the Court waive the stay under Bankruptcy Rule 6006(d). Bankruptcy Rule 6006(d) provides that an order authorizing the assignment of an executory contract or unexpired lease is stayed for 14 days following entry of the order. Fed. R. Bankr. P. 6006(d). An expeditious sale process is crucial to the Debtors' success in these chapter 11 cases to maximize value and minimize administrative costs. Accordingly, the Debtors submit that cause exists to waive the 14-day stay so that the relief

41

requested herein can be granted, and a Sale closed, as soon as practicable after entry of a Sale Order.

**No Prior Request**

52.     No prior request for the relief sought in this Motion has been made to this or any other court.

**Notice**

53.     Concurrently with this filing, copies of this Motion (which sets forth various requested dates relating to the sale) will be provided to (a) the Office of the United States Trustee; (b) counsel to the Debtor's prepetition and postpetition secured lender; (c) the Debtor's largest unsecured creditors; (d) all entities known to have expressed an interest in bidding on the Company Assets; and (e) any party that has requested notice pursuant to Bankruptcy Rule 2002.

54.     In addition, within two (2) business days following entry of the Bidding Procedures Order, the Debtors will provide notice of the Bidding Procedures Order and the Sale Hearing with definitive dates once determined by the Court in the Bidding Procedures Order on the Sale and Bidding Procedures Notice Parties and the Debtor's known creditors.

55.     The Debtors respectfully submit that such notice is sufficient, and request that the Court find that no further notice of the relief requested herein is required.

WHEREFORE, the Debtors respectfully requests that the Court enter an order, substantially in the form filed contemporaneously with this Motion, granting the relief requested herein and such other and further relief as this Court deems appropriate.

42

Dated:  May 31, 2021                    PACHULSKI STANG ZIEHL & JONES LLP

                                        */s/ Laura Davis Jones*
                                        Laura Davis Jones (DE Bar No. 2436)
                                        David M. Bertenthal (CA Bar No. 167624)
                                        Timothy P. Cairns (DE Bar No. 4228)
                                        919 North Market Street, 17th Floor
                                        P.O. Box 8705
                                        Wilmington, Delaware  19899 (Courier 19801)
                                        Telephone:  (302) 652-4100
                                        Facsimile:  (302) 652-4400
                                        Email: ljones@pszjlaw.com
                                               dbertenthal@pszjlaw.com
                                               tcairns@pszjlaw.com

                                        and

                                        CHAPMAN AND CUTLER LLP
                                        Larry G. Halperin
                                        Joon P. Hong
                                        1270 Avenue of the Americas
                                        New York, New York 10020
                                        Telephone: 212-655-6000
                                        Facsimile: 212-697-7210
                                        Email: halperin@chapman.com
                                               joonhong@chapman.com

                                        *Proposed Counsel for the Debtors and Debtors in
                                        Possession*