# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>AVADIM HEALTH, INC. *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 21-10883 (CTG)<br><br>(Jointly Administered)<br><br>Hearing Date:  Aug. 27, 2021 at 3:00 p.m. (ET)<br>Obj. Deadline:  Aug. 17, 2021 at 4:00 p.m. (ET) |

**COMMUNITY HEALTH GROUP, INC.'S MOTION FOR RELIEF
FROM THE AUTOMATIC STAY TO RESUME STATE COURT
PROCEEDINGS TO LIQUIDATE COUNTERCLAIMS**

Community Health Group, Inc. ("CHG") hereby moves (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), granting relief from the automatic stay in order to liquidate its claim in connection with certain state court proceedings and collect solely against proceeds from the applicable insurance policy to the extent there is insurance available to cover such claim.  In support of the Motion, CHG respectfully states as follows:

## JURISDICTION

1.  This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012 (the "Amended Standing Order").  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter a final order consistent with

---

[1] The Debtors, along with the last four (4) digits of each Debtor's federal tax identification number are: Avadim Health, Inc. (8411); Avadim Health IP, Inc. (7594); Bionome Properties Corp. (6483); Quality Assurance Associates, Inc. (5613); and Relion Manufacturing, Inc. (0430). The Debtors' business address is 81 Thompson Street, Asheville, NC 28803.

US.134121713.06

Article III of the United States Constitution. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory and legal predicates for the relief requested herein are section 362(d)(1) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>"), Rules 4001(a) and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rule 4001-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>").

## BACKGROUND

### A. The State Court Litigation

3. On September 23, 2020, Avadim Health, Inc. (the "<u>Debtor</u>" or "<u>Avadim</u>" and together with its co-debtors, the "<u>Debtors</u>") initiated a lawsuit against CHG, among others, (the "<u>State Court Action</u>")[2] in the State of North Carolina General Court of Justice – Superior Court Division (the "<u>State Court</u>"). A true and correct copy of the complaint in the State Court Action is attached hereto as **Exhibit B** (the "<u>Complaint</u>").

4. On December 8, 2020, CHG and its co-defendants filed their operative answer to the Complaint (the "<u>Answer</u>"), asserting various counterclaims against Avadim and Avadim's (soon to be former) Chief Executive Officer, Stephen Woody. A true and correct copy of the Answer is attached hereto as **Exhibit C** (as relevant here, the "<u>Counterclaims</u>").

5. The Complaint and Counterclaims revolve around the termination of the sale of one of Avadim's business units to CHG. As alleged in the Counterclaims, Avadim was in severe financial distress for years. (Exhibit C ¶ 3.) In an effort to reduce costs, Woody and Avadim's then-president, David Fann, decided to wind down Avadim's Community Health business unit and

---

[2] *Avadim Health, Inc. v. Daybreak Capital Partners, LLC, Community Health Group, Inc., Craig Harkey d/b/a Hark Health Servs.*, Case No. 20CV-03334 (N.C. Super. Ct. 2020).

2

lay off almost all of its employees in early 2020. (*Id.* ¶¶ 7-8.) Those employees subsequently engaged an investor and established a team to lead a transaction and acquire the business unit that Avadim sought to abandon. (*Id.* ¶ 10.)

6. Effective March 20, 2020, Avadim agreed to sell its Community Health business unit to CHG pursuant to the terms set forth in a letter of intent (the "LOI"), including a $10 million purchase price that Avadim requested. (*Id.* ¶ 11.) The terms of the LOI required the parties to, among other things, negotiate exclusively with each other in good faith, and provided for a $2.5 million break-up fee if Avadim ultimately pursued an alternative arrangement. (*Id.* ¶¶ 14-15.) The parties also agreed to an interim distribution contract that allowed CHG to start developing business right away, prior to sale closing. (*Id.* ¶¶ 25-26.) In the ensuing months, Woody assured the former employees that Avadim was committed to the deal and to supporting the new company. (*See id.* ¶¶ 28-33, 85.)

7. CHG started developing business, quickly sourcing millions of dollars in sales, and hundreds of millions more in potential sales. (*Id.* ¶ 33.) But, when Woody and Avadim saw this success, they changed their minds about completing the transaction. (*Id.* ¶¶ 34, 38.) Avadim delayed the sale closing while simultaneous reviving its once-abandoned Community Health business unit. (*Id.* ¶¶ 38-39.) Moreover, Woody and Avadim solicited CHG's customers and business leads. (*Id.* ¶¶ 39, 40, 44, 75.) Avadim never provided any compensation to CHG, nor has it kept its contractual commitments—including paying the $2.5 million break-up fee. (*See generally id.*)

8. Notwithstanding its own bad faith actions, Avadim initiated the State Court Action against CHG, among others, seeking a declaration that it was not obligated to pay the $2.5 million break-up fee provided for in the LOI. (*See* Exhibit B.) In response, CHG filed the Counterclaims,

3

including under the North Carolina Racketeer Influenced and Corrupt Organizations Act, N.C. Gen. Stat. § 75D-1, *et seq.* ("N.C. RICO Act") and North Carolina's Unfair and Deceptive Practices Act, N. C. Gen. Stat. § 75-1.1, *et seq*. (the "Unfair and Deceptive Practices Act"), against Avadim and joined Woody as an additional counterclaim defendant.

9. On February 1, 2021, Avadim and Woody filed a joint motion to dismiss the Counterclaims. On February 22, 2021, CHG and its co-plaintiffs filed a response in opposition to the motion to dismiss.

10. On May 31, 2021 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. As a result, the State Court Action was stayed as to Avadim pursuant to section 362(a) of the Bankruptcy Code.

11. Following a Court-approved sale process, this Court authorized the sale of substantially all of the Debtors' assets (the "Sale") to Stalking Horse Midava Holdings 3, Inc. by order dated August 1, 2021 [D.I. 239] (the "Sale Order"). The deadline to close the Sale was August 9, 2021. [D.I. 115.]

**B.    The Insurance Policy**

12. Through discovery in the State Court Action, CHG learned that Avadim purchased an insurance policy (the "Insurance Policy")[3], which provides coverage for Avadim and its officers and directors in connection with claims made against them—including the Counterclaims—for the period February 29, 2020 through February 28, 2021. The Insurance Policy includes certain fiduciary liability provisions. Upon information and belief and subject to its terms and conditions, the Insurance Policy covers defense costs, as well as damages for Woody's liability in connection with the Counterclaims.

---

[3]    A copy of the relevant insurance information produced by Avadim in connection with the State Court Action is attached hereto as **Exhibit D**.

4

**RELIEF REQUESTED**

13. By this Motion, CHG seeks entry of the Proposed Order granting relief from the automatic stay under section 362(d)(1) of the Bankruptcy Code, Bankruptcy Rules 4001 and 9014, and Local Rule 4001-1, to permit the State Court Action to proceed so that CHG may liquidate its Counterclaims against Avadim and collect solely against proceeds from the Insurance Policy to the extent there is insurance available to cover such claim.

**BASIS FOR RELIEF**

**A.  Cause Exists to Modify the Automatic Stay to Permit CHG to Liquidate its Counterclaims and Collect Solely Against Proceeds from the Insurance Policy.**

14. Section 362(d)(1) of the Bankruptcy Code allows the Court to modify the automatic stay "for cause." 11 U.S.C. § 362(d)(1). While "cause" is not defined in the Bankruptcy Code, courts have held that it "is a flexible concept and courts often conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay." *In re SCO Group, Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007).

15. When a motion for relief from the automatic stay is based upon a showing of "cause," section 362(g) of the Bankruptcy Code places the ultimate burden of proof on the debtor. *See* 11 U.S.C. § 362(g); *In re Planned Sys., Inc.*, 78 B.R. 852, 859 (Bankr. S.D. Ohio 1987) (providing that "[a]fter the moving party establishes a *prima facie* case, the burden of producing evidence, as well as the ultimate burden of proof, i.e., risk of non-persuasion, shifts to the debtor").

16. When analyzing whether "cause" exists under section 362(d) of the Bankruptcy Code, courts generally consider the following factors: (1) the prejudice suffered by the debtor and the debtor's estate if the stay is lifted to allow a civil lawsuit to continue; (2) the balancing of hardships between the parties; and (3) the probability of success on the merits if the stay is lifted. *See, e.g., Izzarelli V. Rexene Procs. Co. (In re Rexene Prod. Co.)*, 141 B.R. 574, 577 (Bankr. D.

Del. 1992); *accord In re Abeinsa Holding, Inc.*, Case No. 16-10790 (KJC), 2016 WL 5867039, at *2 (Bankr. D. Del. Oct. 6, 2016). The legislative history of section 362(d) of the Bankruptcy Code makes clear that "cause" includes "a desire to permit an action to proceed in another tribunal." H.R. Rep. No. 595, 95th Cong., 1st Sess. 343 (1977).

17. Courts often modify the automatic stay for "cause" to allow a party to obtain a judgment and collect from a debtor's insurer, without prejudicing the debtor's estate. *See, e.g., Int'l Bus. Machines v. Fernstrom v. Van Co. (In re Fernstrom & Van Co.)*, 938 F.2d 731 (7th Cir. 1991); *In re Loudon*, 284 B.R. 106, 108 (B.A.P. 8th Cir. 2002) (order lifting stay to allow litigation involving debtor to proceed in state court forum was not abuse of discretion, where bankruptcy court sought to limit potential harm to debtor by allowing state court to determine liability and damages, but limited ability of movant to enforce any judgment entered in its favor); *In re R.J. Groover Const., L.L.C.,* 411 B.R. 460, 465 (Bankr. S.D. Ga. 2008) ("[T]he other creditors in the debtors' bankruptcy will not be harmed by granting the motion because any possible recovery will be limited to the available insurance proceeds, and [the movant] will not be able to enforce any judgment against the debtors or the estate without further order of this Court.").

18. The rationale behind such modification is as follows:

> When the Court is reasonably confident that the policy proceeds will be sufficient to satisfy all creditors with claims that may be paid under the policy, the court should grant relief from stay to permit an action either against the debtor, if necessary, or against the insurer. Because the policy proceeds will be available only to creditors with the type of claims covered by the policy, there is no depletion of assets that would otherwise be available to satisfy general, unsecured claims, and there is therefore no reason to delay the creditor seeking to recover under the policy. Moreover, the insurer will almost invariably be responsible for the cost of defense, so there should be no added expense for the estate.

3 COLLIER ON BANKRUPTCY ¶362.07[3][a][I] (Lawrence P. King, ed., 15th Ed. Revised 1999).

US.134121713.06

19. The Debtors will not be prejudiced by the continuation of the State Court Action—which Avadim itself commenced—where, as here, CHG's objective is to liquidate its Counterclaims against Avadim to collect solely against proceeds from the Insurance Policy to the extent there is insurance available to cover CHG's claim. Upon information and belief, the costs of defending against the Counterclaims will not be paid from the Debtors' estates, but rather from the Insurance Policy pursuant to its provisions. And, as it relates to claims against Woody, any damages that CHG may recover will likely be paid from the proceeds of the Insurance Policy.

20. Moreover, the State Court Action will not interfere with the chapter 11 bankruptcy cases because the Court-approved Sale of substantially all of the Debtors' assets has presumably closed, or should have closed. Any members of the Debtors' management involved in the State Court Action, namely Woody, will have a minimal role, if any, in the Debtors' bankruptcy cases going forward and will have few duties to the Debtors after closing. Further, Avadim already has counsel for the State Court Action with knowledge of the case and the issues, separate and apart from the Debtors' bankruptcy counsel.

21. Permitting the continuation of the State Court Action will in fact promote judicial economy because CHG's Counterclaims against Avadim must be liquidated at some point during these chapter 11 cases, and the closing of the Sale supports granting stay relief now to facilitate a prompt resolution of the competing claims. *In re Tribune Co.,* 418 B.R. 116, 126 (Bankr. D. Del. 2009) ("It will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from duties that may be handled elsewhere.") (citing *In re SCO Group, Inc.,* 395 B.R. at 856) (quoting legislative history to section 362(d)(1) in H. R. Rep. No. 595, 95th Cong., 1st Sess., 341 (1977)). The Complaint and the Counterclaims

involve highly complex issues arising under North Carolina law, including the N.C. RICO Act and Unfair and Deceptive Practices Act, and the parties have already briefed the motion to dismiss the Counterclaims prior to the Petition Date. Thus, the North Carolina State Court is the most practical and efficient forum to adjudicate the State Court Action and would provide the estates the benefit of a forum intimately familiar with North Carolina law. *See In re Schaffer*, 597 B.R. 777, 795 (Bankr. E.D. Pa. 2019) (observing that "litigating in the bankruptcy forum which has no familiarity with the underlying substantive claims would likely be more burdensome to the Debtor and the estate than concluding litigation in State Court."); *In re Marvin Johnson's Auto Serv., Inc.,* 192 B.R. 1008, 1017 (Bankr. N.D. Ala. 1996) ("The state court judge is familiar with the law which forms the framework for the resolution of the issues involved in the case. These facts weigh in favor of granting relief from the stay since the state court should be more familiar and more experienced with state law issues than the bankruptcy court and a determination of the issues involved in the litigation will not require the expertise of a bankruptcy judge."). Moreover, while this Court is certainly capable of immersing itself and learning about the N.C. Rico Act, and the Unfair and Deceptive Practices Act, those issues and the development of North Carolina law on those points are more important to, and best left to the North Carolina State Court.

22. In contrast, failure to lift the automatic stay will result in hardship to CHG, which has already expended significant time and expense defending against the Complaint, pursuing the Counterclaims, briefing the motion to dismiss the Counterclaims, and engaging in discovery. *See Marvin Johnson's*, 192 B.R. at 1019 ("[T]he hardships that will result to [movant] if he is denied relief from the stay are apparent. [Movant] will be forced to try his case twice, once against the debtor in the bankruptcy court and a second time in the state court against [the state court co-defendant], with concomitant delay and additional personal expense."). The same hardship would

be present for CHG in this case, as this Court lacks jurisdiction over the dispute between CHG and Woody, two non-debtors.

23. When a party seeks to lift an automatic stay, the required showing for the movant's probability of success is "very slight." *Rexene*, 141 B.R. at 578; *see also In re Cont'l Airlines, Inc.*, 152 B.R. 420, 426 (D. Del. 1993) (finding that "[e]ven a slight probability on the merits may be sufficient to support lifting an automatic stay in an appropriate case."). It "merely requires a showing that [the movant's] claim is not frivolous." *Levitz Furniture Inc. v. T. Rowe Price Recovery Fund L.P. (In re Levitz)*, 267 B.R. 516, 523 (Bankr. D. Del. 2000). Here, Avadim initiated the State Court Action, and CHG has asserted meritorious Counterclaims therein. The forthcoming ruling on the motion to dismiss the Counterclaims, which has already been briefed and remains pending before the North Carolina State Court, will demonstrate that the Counterclaims asserted in the State Court Action are *bona fide* claims that are "not frivolous." *See id.*

24. For the foregoing reasons, cause exists to modify the automatic stay pursuant to section 362(d) of the Bankruptcy Code.

**B.    The Insurance Policy Proceeds Realized Pursuant to the Fiduciary Provisions are Likely Not Property of the Estate.**

25. "When a debtor's liability insurance policy only provides direct coverage to the debtor, courts generally hold that the proceeds are property of the estate. Conversely, when the liability insurance policy only provides direct coverage to the directors and officers, courts generally hold that the proceeds are not property of the estate." *In re Downey Fin. Corp.*, 428 B.R. 595, 604 (Bankr. D. Del. 2010); *see also In re Allied Digital Techs. Corp.*, 360 B.R. 505, 509 (Bankr. D. Del. 2004). Notwithstanding this general rule, "Cases determining whether the proceeds of a liability insurance policy are property of the estate are controlled by the language

and scope of the specific policies at issue." *Downey Fin. Corp.*, 428 B.R. at 603; *see also Allied Digital*, 306 B.R. at 509.

26. "When the liability insurance policy provides direct coverage to [multiple] parties, 'the proceeds will be property of the estate if the depletion of the proceeds would have an adverse effect on the estate to the extent the policy actually protects the estate's other assets from diminution.'" *Downey Fin. Corp.*, 428 B.R. at 603 (quoting *Allied Digital*, 306 B.R. at 512). But, "when a debtor corporation owns a liability policy that exclusively covers its directors and officers, . . . the proceeds of that D&O policy are *not* part of the debtor's bankruptcy estate." *In re Matter of Vitek, Inc.*, 51 F.3d 530, 533 (5th Cir. 1995) (emphasis in original); *accord Downey Fin. Corp.*, 428 B.R. at 604. "In essence and at its core, a D&O Policy remains a safeguard of officer and director interests and not a vehicle for corporate protection." *See In re First Cent. Fin. Corp.*, 238 B.R. 9, 16 (Bankr. E.D.N.Y. 1999)).

27. Here, the Counterclaims largely focus on the unlawful actions of Woody in his capacity as Chief Executive Officer of the Debtor. As such, the litigation—including the costs of defense—is subject to the fiduciary liability provisions of the Insurance Policy. Such a provision is designed to protect the rights and interests of the directors and officers in the first instance, not the Debtor. Accordingly, any proceeds realized from the fiduciary liability provisions of the Insurance Policy are not property of the estate. *See, e.g., Downey Fin. Corp.*, 428 B.R. at 603; *Allied Digital*, 306 B.R. at 512-13 (concluding that because the policy provided direct coverage to directors and officers for claims and defense costs, and indemnification coverage to the debtor for amounts paid to directors and officers, the proceeds were not property of the bankruptcy estate).

## NOTICE

28. Notice of this Motion has been provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Debtors; (iii) counsel to Stephen Woody;

(iv) counsel to the Insurance Policy's insurer; and (v) all parties requesting notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002 as of the date hereof. In light of the nature of the relief requested herein, CHG submits that no other or further notice is necessary.

[*Remainder of Page Intentionally Left Blank*]

**CONCLUSION**

WHEREFORE CHG respectfully requests that the Court enter the Proposed Order granting the Motion and granting any such other and further relief as the Court deems just and proper.

Dated: August 10, 2021
Wilmington, Delaware

**FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/ Brett D. Fallon*

Brett D. Fallon (Del. Bar No. 2480)
Jaclyn C. Marasco (Del. Bar No. 6477)
222 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone:   (302) 467-4200
Facsimile:   (302) 467-4201
E-mail:   Brett.Fallon@faegredrinker.com
  Jaclyn.Marasco@faegredrinker.com

-and-

James L. Volling
Matthew Kilby
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone:   (612) 766-7000
Facsimile:   (612) 766-1600
E-mail:   James.Volling@faegredrinker.com
  Matthew.Kilby@faegredrinker.com

-and-

Robert S. Goldstein
1144 15th Street, Suite 3400
Denver, Colorado 80202
Telephone:   (303)-607-3500
Facsimile:   (303) 607-3600
E-mail:   Rob.Goldstein@faegredrinker.com

*Attorneys for Community Health Group, Inc.*